## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANTRIC EDWARD KLAIBER | * | |
| Petitioner, | * | |
| v. | * | Civil Action No. PX-19-3444 |
| | | Crim. No. PX-16-415 |
| UNITED STATES OF AMERICA, | * | |
| Respondent. | * | |
| | *** | |

## MEMORANDUM OPINION

Petitioner Antric Edward Klaiber is detained in immigration custody facing certain removal from the United States after having pleaded guilty to two aggravated felonies.  He moves pursuant to 28 U.S.C. § 2255 to vacate those convictions because his lawyer misadvised him of the immigration consequences in advance of his plea.  ECF No. 88.  Alternatively, Klaiber contends that his then-reasonable belief that he was a United States citizen, which the U.S. Government repeatedly reaffirmed, rendered his guilty plea involuntarily obtained and in violation of the Due Process Clause of the Fifth Amendment.  *Id*.  With the parties' consent, this Court held a two-day virtual evidentiary hearing on June 15 and June 19, 2020.  ECF Nos. 158 & 166.  For the reasons that follow, Klaiber's petition is GRANTED and his convictions are VACATED.

### I.    Background

For the majority of Antric Klaiber's adult life, he had been assured and reassured by the United States Government that he was an American citizen.  ECF No. 88-2 at 20; Ex. 3; Ex. 9 ¶ 57; ECF No. 166 Tr. 79:22-24.  Klaiber arrived in the United States from Guyana in 1984, at the age of eight, as a legal permanent resident.  Ex. 2.  At eighteen, believing that he had derived

United States citizenship based on his father's naturalization, Klaiber applied for and was granted a United States passport.  ECF No. 88-2 at 20; ECF No. 166 Tr. 71:23-72:9.  Klaiber held that passport and, along with it, the sincere belief that he was a United States citizen for over *twenty years*.  *Id.* at 113:22-114:4.  It turns out his passport had been issued in error.  Ex. 5.  He was not lawfully entitled to derivative citizenship in 1996, and thus not entitled to a passport, because his mother did not naturalize before his eighteenth birthday.  *Id.*

Klaiber did not learn of this error for twenty-three years, until May 2019, despite numerous opportunities for Homeland Security, the Department of State, ICE agents and even his own defense counsel to apprise him otherwise.  *Id.*; ECF No. 166 Tr. 118:10-119:6.  Because Klaiber's particular history in this respect remains critically important to this Court's decision, the Court lays out its factual findings in detail and in chronological order.

**A.  1984 – Klaiber arrives in the United States**

In 1984, eight-year-old Antric Klaiber left Guyana for the United States with his parents and siblings.  Ex. 2; ECF No. 166 Tr. 71:11-17.  All arrived in America as legal permanent residents.  *Id.* at 71:18-21.  They settled in Silver Spring, Maryland and worked hard in their new homeland.  Ex. 9 ¶¶ 57, 60; Ex. 105.  When Klaiber was sixteen, his father became a United States citizen.  ECF No. 166 Tr. 71:23-72:2.

Growing up, Klaiber was quickly recognized for his talents as a basketball player.  Ex. 9 ¶ 72.  He excelled as a power forward in high school and received a full athletic scholarship to the University of Connecticut.  *Id.* ¶ 73.  There, he studied business management and played for

UConn his entire college career.  *Id.*  In 1999, Klaiber and his teammates clinched the prestigious

NCAA championship.  ECF No. 67-33 at 3.

      **B.    1996 – Klaiber is issued a United States Passport**

      Klaiber believed that he received "derivative" citizenship at the age of sixteen through his

father's naturalization.  ECF No. 166 Tr. 71:22-72:1.  As Klaiber's basketball career took off, so

too did his opportunities for international travel.  *Id.* at 72:3-7.  While still a student at UConn,

and with the help of the coaching staff, Klaiber applied for and received a United States passport

in 1996.  *Id.* at 71:23-72:18.  It is clear from the original passport application that Klaiber

honestly disclosed that only his father had naturalized, and on this basis, Klaiber received a

United States passport as a derivative citizen.  Ex. 105; ECF No. 88-2 at 20.

      Klaiber traveled extensively abroad for the next 6 years.  ECF No. 166 Tr. 75:7-13.  He

visited over thirteen countries playing college and professional basketball.  *Id.*  Never during any

such travel did Klaiber encounter any problems with his passport.  *Id.*  He also successfully

renewed his passport twice, all without incident.  *Id*. at 74:15-19; Ex. 106 & 107.  The most

recently issued passport remained valid until 2021.  ECF No. 88-2 at 24; ECF No. 166 Tr. 74:20-

22.

      After Klaiber stopped playing basketball, he returned to Maryland to be close to his

family.  He had two children and started his own business.  ECF No. 9 ¶¶ 59, 61-62, 78; ECF

No. 88-2 ¶ 32.  He also had some scrapes with the law.  In 2009, he pleaded nolo contendere to a

marijuana possession charge, and less than a year later, guilty to marijuana importation.  *Id.* ¶¶

40-41; ECF No. 166 Tr. 76:1-7.  In his 2010 case, Klaiber received probation which he

completed.  ECF No. 9 ¶¶ 40-41.  In neither of Klaiber's state cases was his American citizenship ever called into question.  ECF No. 166 Tr. 75:23-25.

### C.  2013 – ICE encounter with Klaiber

In March 2013, the Department of Homeland Security Immigration and Customs Enforcement ("ICE"), as part of a routine review, identified Klaiber as an individual facing possible deportation and assigned his case to ICE Officer Larry Singleton ("Singleton").  ECF No. 158 Tr. 26:22-25; 29:1-6; 29:24-30:2; 30:7-19; Ex. 25; Ex. 28 at 32.  After reviewing Klaiber's file, Singleton prepared to find, detain, and possibly take Klaiber into ICE custody.  Ex. 28: ECF No. 158 Tr. 30:14-33:4.

In July 2013, Singleton called Klaiber on the phone and arranged to meet Klaiber under the pretense of "inspecting" Klaiber's car believed to be involved in a crime.  ECF No. 166 Tr. 76:10-18.  Klaiber complied and ICE immediately detained him.  *Id.* at 76:19-25.  During transport to ICE detention, Klaiber told the agents that he was an American citizen with a valid passport.  *Id.* at 77:11-14.  The agents abruptly stopped the transport, made some phone calls, confirmed that he possessed a valid U.S. passport, and released him.  *Id.* at 77:15-78:11.  Singleton also told Klaiber that he would "close [his] case," provided Klaiber faxed a copy of his passport to ICE's Baltimore office.  *Id.* at 78:8-11.

Although Klaiber vividly recalls having faxed his passport to Singleton the next day and following up with a phone call to confirm the receipt, no record evidence memorializes the fax.  *Id.* at 79:11-18; ECF No. 158 Tr. 40:20-22.  What is clear, however, is that ICE took no further action against Klaiber.  *Id.* at 37:9-12; ECF No. 166 Tr. 79:23-80:8.  Klaiber thus believed, as he

had for the past 17 years, his U.S. passport was valid, that he was a United States citizen, and that he had derived citizenship from his father's naturalization.  *Id.* at 80:2-8.

### D.  Klaiber's 2016 federal criminal case

On April 20, 2016, Klaiber was charged with federal drug and firearms charges before this Court.  ECF Nos. 1 & 88-2 ¶ 17.  At his detention hearing, the Assistant United States Attorney announced that although Klaiber appeared to have a valid United States passport, the pre-trial services report indicated he was a legal permanent resident subject to removal proceedings.  ECF No. 88-1 at 8; ECF No. 97 at 6; ECF No. 166 Tr. 80:23-81:1.  Learning this, Klaiber believed that the same mistake which occurred in 2013 was happening again.  *Id.* at 83:21-24.  Accordingly, he became fixed on clearing up any issue regarding an "immigration detainer."  *Id.* at 82:15-17; 83:10-13; 83:21-24; ECF No. 158 Tr. 93:23-24.

Assistant Federal Public Defender, Julie Stelzig ("Stelzig") assumed responsibility for representing Klaiber shortly after the detention hearing.  ECF No. 166 Tr. 81:12-13; ECF No. 158 Tr. 83:5-6.  Recognizing her obligations pursuant to the landmark Supreme Court decision *Padilla v. Kentucky* to provide clear advice as to the immigration consequences of Klaiber's federal charges, and in light of the Government's representations at the detention hearing, Stelzig began her due diligence as to Klaiber's citizenship status.  Ex. 39 at 2; ECF No. 158 Tr. 93:4-18.

First, Stelzig learned from Klaiber his above described history.  ECF No. 166 Tr. 84:11-85:2; ECF No. 158 Tr. 89:23-90:12; 93:19-21.  Next, Stelzig hired an immigration attorney, Thomas Ragland, as an immigration expert to help her fulfill her *Padilla* obligations in representing Klaiber.  *Id.* at 97:2-13; Ex. 39; ECF No. 166 Tr. 173:22-174:22.  Stelzig specifically hired Ragland to advise her on whether Klaiber had in fact obtained derivative citizenship through his father's naturalization.  Ex. 41 & 43; ECF No. 158 Tr. 99:2-101:4.

Ragland undoubtedly did his job.  Shortly after he was retained, Ragland emailed Stelzig advising her of the express requirements under the Immigration Nationality Act ("INA 321"), 8 U.S.C. § 1432, to obtain derivative citizenship in 1996.  Ex. 48.  Ragland explained to Stelzig that at that time that Klaiber could *not* have obtained derivative citizenship through his father's naturalization alone.  *Id.*  If Klaiber's mother had not also naturalized before Klaiber's eighteenth birthday, as Ragland rightly advised, then Klaiber could have obtained citizenship only if his mother was either dead or separated from his father and his father had legal custody of Klaiber.  Neither appeared to be the case.  *Id.*; ECF No. 166 Tr. 167:25-168:10.  Stelzig responded that she knew Klaiber's mother to be alive, still continuously married to Klaiber's father, and only recently naturalized in 2016.  Ex. 48.

Ragland, in turn, submitted FOIA requests in November 2016 for the entirety of Klaiber's Alien File ("A file") to try to determine how Klaiber could have been issued a passport based on his derivative citizenship.  Ex. 47, 48, 52, & 53.  During the course of Klaiber's criminal case, and despite best efforts, Ragland never received the entirety of Klaiber's A-file.  Ex. 73; ECF No. 158 Tr. 129:14-17; ECF No. 166 Tr. 181:16-183:19.

In January 2017, Ragland and Stelzig communicated about Klaiber's immigration status in light of Klaiber's pending criminal case.  Ex. 61.  Ragland plainly stated to Stelzig he was "not too hopeful" that Klaiber had derivative citizenship.  *Id.*  Ragland also made clear to Stelzig that Klaiber's passport may have been issued in error and that "as a matter of law he may not be a U.S. citizen."  *Id.*  Before this exchange, Ragland had also briefly spoken with Klaiber to confirm that his parents were never divorced and when his mother had been naturalized.  *Id.*; ECF No. 166 Tr. 160:21-161:20.  But at no point during that conversation did Ragland discuss with Klaiber the very advice he would later give Stelzig.  *Id.* at 161:1-20; 163:16-25.  Ragland

rightly viewed his role as an advisor to criminal defense counsel, not as an attorney providing direct representation to Klaiber. *Id.* at 161:1-20; 163:16-25; 177:10-23.

Several months later, Ragland again clearly communicated to Stelzig that Klaiber was likely not a U.S. citizen and that his passport appeared to have been issued in error. Ex. 73. Although Ragland told Stelzig he was not "one-hundred percent" certain, he was nonetheless "pretty confident" that Klaiber was not a derivative citizen. ECF No. 166 Tr. 171: 14-16.

As for what Stelzig relayed to Klaiber, Stelzig testified that she generally followed her practice to communicate whatever advice she received from immigration counsel to her clients, but nowhere is the substance of what she told Klaiber memorialized in any contemporaneous notes. ECF No. 158 Tr. 88:21-89:5.[1] Nor did Stelzig provide Ragland's emails to Klaiber out of concern that Klaiber's privacy could be compromised in a jail setting. *Id.* at 88:21-89:5; 108:16-18; 109:11-23; 112:22-25. Accordingly, the Court is left with Stelzig's testimony at the evidentiary hearing about precisely what advice she gave Klaiber regarding the immigration consequences of his federal charges if convicted. *Id.*

At the evidentiary hearing, Stelzig testified that although she advised Klaiber that his citizenship was an "open question," she also told Klaiber that in her view, Klaiber "*was* a U.S. citizen until proven otherwise." *Id.* at 118:2-120:5; 132:14-21; 142:6-14. Stelzig further confirmed for Klaiber the soundness of this logic because, to her, no "evidence" existed to

---

[1] Certain record evidence suggests that Stelzig's investigator, Clare Benack, discussed with Klaiber that Ragland was "not too optimistic" as he waited for the FOIA response. Ex. 62 at 4; *see also* Ex. 68 (email in which Benack confirms to Stelzig that she "passed along" Raglan's information to Klaiber). Benack, however, could not recall any of the details surrounding what she discussed with Klaiber. ECF No. 166 Tr. at 196-97, 199. Benack also readily admitted that she is not an attorney and so cannot, and does not, administer legal advice. *Id.* at 200-01. Thus, this communication does not support that Stelzig directly advised Klaiber that he was likely not a derivative citizen, as Ragland had advised Stelzig.

"determin[e] he was *not* a United States citizen." *Id.* at 132:17-22.[2]  Indeed, Stelzig specifically

testified that despite having been advised by Ragland that Klaiber was likely not a derivative

citizen, she would *not* have communicated that same advice to Klaiber.  *Id.* at 118:7-11 (Q:

Would you have told Mr. Klaiber that he was not a citizen—not a derivative citizen as a matter

of law? A: No, I would not have told him that.  I would—that had not been established as far as I

was concerned.").

As for the presence of a detainer, Stelzig asked the Assistant United States Attorney for

confirmation that no detainer had been lodged against him.  *Id.* at 126:4-13.  Stelzig knew that

this information was critically important to Klaiber because, to him, the absence of a detainer

confirmed that the Government also viewed him as a United States citizen.  *Id.* at 93:22-24; Ex.

56; ECF No. 166 Tr. 83:4-24; 85:22-25; 88:2-89:6; 146:15-147:2.  Klaiber communicated as

much to Stelzig in person and in writing.  Ex. 58; ECF No. 166 Tr. 83:4-13; 88:13-21; 123:21-

24.

Meanwhile, Klaiber continued to defend vigorously the underlying criminal case.  *Id.* at

109:9-22.  Stelzig had filed several substantive motions to suppress evidence on his behalf.  *Id.*

The Court had scheduled a hearing on the motions for May 25, 2017.  ECF No. 33.

Shortly before the hearing, the Government extended Klaiber a written plea offer in

which he would plead guilty to possession with intent to distribute marijuana and cocaine, in

violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and felon in possession of a firearm and

ammunition, in violation of 18 U.S.C. § 922(g)(1).  Ex. 71.  The two offenses carry the most

---

[2] Klaiber also received further confirmation from the U.S. Citizenship and Immigration Services.  During this time, Klaiber pursued obtaining an I-600 certificate of citizenship as further proof of his derivative citizenship. ECF No. 166 Tr. 91:14-93:14. In preparation to complete the form, he called the USCIS customer service number. *Id.*  He was told, rightly, that if he had a validly issued United States passport, he did not also need the certificate as proof of citizenship, and so he did not apply for it.  *Id.;* ECF No. 158 Tr. 91:21-92:3.

dire immigration consequences.  Each are "aggravated felonies" under the INA, which subjects any non-citizen convicted of such offenses to presumptive *mandatory* deportation and a *lifetime ban* from the United States.  ECF No. 158 Tr. 149:25-150:3; *see* 8 U.S.C. § 1227(a)(2)(A)(iii); *Lee v. United States*, 137 S. Ct. 1958, 1963 (2017).

Klaiber had five days to decide if he would accept the plea offer.  Ex. 71 & 72.  At no time during this period, or at any time before, did Stelzig tell Klaiber that if was not a citizen, pleading guilty to such offenses would result in presumptive mandatory deportation.  ECF No. 166 Tr. 98:2-99:16.  Rather, Stelzig communicated to Klaiber only that as aggravated felonies, they "would *potentially* expose somebody who [is] not a U.S. citizen to removal proceedings."  ECF No. 158 Tr. 148:18-23; *see also* ECF No. 166 Tr. 97:20-98:4.

As for Klaiber's citizenship, Stelzig confirmed for Klaiber that, according to the Assistant United States Attorney, no immigration detainer had been lodged.  ECF No. 158 Tr. 126:7-15; 139:22-140:10.  However, Stelzig did not clearly communicate Ragland's advice, that in short, Klaiber was nonetheless likely not a United States citizen.  *Id.* at 119:19-23; 124:10-13.  Rather, as Stelzig confirmed at the evidentiary hearing, she maintained to Klaiber that he was a citizen "until proven otherwise."  *Id.* at 119:19-23; 134:10-13; ECF No. 166 103:5-7.

At the plea hearing, the Court advised Klaiber, as it must, about the consequences of pleading guilty.  *See* Fed. R. Crim. P. 11(b)(1).  In response, both Klaiber and his counsel confirmed for the Court that he had obtained derivative citizenship.  The colloquy is as follows:

THE COURT: Okay. Now, when you plead guilty—in this case, you're pleading guilty to a felony offense—there are valuable civil rights that can be impacted. First question I have for you is: Are you a United States citizen, born in the United States?

THE DEFENDANT: I wasn't born but naturalized citizen, ma'am.

THE COURT: Okay, so you are naturalized?

THE DEFENDANT: Yes.

MS. STELZIG: **Yes, Your Honor. My understanding is that he obtained derivative citizenship**, and he's received two United States passports and traveled quite a bit for his professional basketball career outside of the country.

ECF No. 76 at 16.

Notably, Stelzig had affirmed before the Court not only her view that Klaiber was a citizen, but more precisely a derivative citizen. *Id.*; ECF No. 158 Tr. 106:11-23; 119:19-23; 134:7-13. When pressed at the evidentiary hearing to explain the reason why she said as much to the Court, especially in light of Ragland's advice, Stelzig reaffirmed that she based this statement on her belief that Klaiber had a "valid claim to U.S. citizenship," that had "not been proven to the contrary." *Id.* at 134:7-13; 135:11-13.

During this colloquy, the Government never corrected Stelzig's representations. Nor did Klaiber because, in his view, Stelzig's open court comment was correct and entirely consistent with the advice she had given him. ECF No. 166 Tr. 106:18-107:5. The Court concluded that portion of the colloquy with the standard advisement that pleading guilty to felony offenses generally may result in deportation. ECF No. 76 at 16-17.

### E. The Presentence Report

At the conclusion of Klaiber's guilty plea, the Court ordered the preparation of a Pre-Sentence Report ("PSR"). *Id.* at 38. The Court, as is custom, advised Klaiber that the PSR is a "very important document" designed to assist the Court in imposing a fair sentence, and so its accuracy is of paramount importance. *Id.*

The initial draft report noted that Klaiber was both an "LPR" (legal permanent resident) *and* a U.S. citizen, but also that he was subject to deportation proceedings. Ex. 79 at 4. Stelzig noted her objection to this section, supplying to the PSR writer Klaiber's United States passport as proof of his citizenship. ECF No. 158 Tr. 137:12-15; 138:4-10. Stelzig also testified that she had discussed with Klaiber the possibility of moving to withdraw his guilty plea if the final PSR did not ultimately state that he was a United States citizen. *Id.*; *see also* ECF No. 166 Tr. 109:9-15.

After receiving Stelzig's objection, PSR writer Tracy Reid contacted ICE Officer Charles Smittick ("Smittick") to verify Klaiber's citizenship status. Ex. 123. A deportation officer since 2009, Smittick testified that he is well versed in the requirements of derivative citizenship and how to investigate such a claim when asserted by a foreign-born person. ECF No. 158 Tr. 167:23-25; 199:15-200:9. He has investigated thousands of citizenship claims over the course of his career. *Id.* at 200:10-13.

In Klaiber's case, Smittick searched the State Department's database, which proved that Klaiber been issued a valid U.S. passport. *Id.* at 189:18-20; 192:3-9; Ex. 23. Smittick conveyed what he learned to Reid and confirmed that Klaiber was a United States citizen based on derivative citizenship. ECF No. 158 Tr. 192:6-9; Ex. 9 & 123. Smittick took no further steps to verify whether Klaiber, in fact, met the clear criteria to obtain derivative citizenship despite his access to multiple databases with pertinent information. ECF No. 158 Tr. 213:18-214:6. Nor did he review Klaiber's A-file, which he physically possessed at the time of the inquiry. *Id.* at 192:3-20; 205:5-13; 224:10-15. Smittick instead relied on the State Department, satisfied they had "done their job." *Id.* at 212:6-10.

As Stelzig had urged, the final PSR confirmed that "[a]ccording to ICE, the defendant is a U.S. citizen."  Ex. 9 ¶ 57.  For Stelzig and Klaiber, this clear statement by ICE, included in the final PSR, settled the matter.  ECF No. 158 Tr. 139:4-21; 160:14-20; ECF No. 166 111:5-14. Klaiber saw no reason to withdraw his guilty plea.  *Id.* at 112:1-4.  The Court sentenced Klaiber on October 10, 2017, to 33 months' incarceration followed by three years of supervised release.[3] ECF No. 70.

After Klaiber's sentencing, Stelzig emailed Ragland to inform him that Klaiber's case concluded with the PSR determining that Klaiber was a United States citizen.  ECF No. 158 Tr. 163:3-21.  Ragland, responded that this confirmation was "sufficient."  Ex. 169.  When asked at the evidentiary hearing what he meant by "sufficient," Ragland explained that a "person is a citizen only if the government says so," and that ICE officials had confirmed as much.  ECF No. 166 Tr. 185:16-186:15.

## F.  Detention, Release, and Subsequent Arrest

Klaiber served the entirety of his prison sentence at FCI Allenwood, Pennsylvania ("Allenwood").  ECF No. 88-2 ¶ 28.  When he first arrived at Allenwood, he was informed that he would be subjected to a routine interview by ICE that every "foreign-born" inmate must undergo.  Ex. 20; ECF No. 158 Tr. 234:11-235:4.  This interview, conducted in November of 2017, was brief and took place alongside other inmates subjected to the same process.  ECF No. 166 Tr. 115:6-10.  During the interview, immigration agents assured Klaiber that he would be

---

[3] Because the Court too believed Klaiber to be a United States citizen, the Court believed that Klaiber's rehabilitation would be aided by a lengthy period of supervision, which could not be accomplished if he were subject to deportation.  *See* U.S.S.G. § 5D1.1(c) (U.S. Sentencing Comm'n 2018) ("The court ordinarily should not impose a term of supervised release in a case in which . . . the defendant is a deportable alien who likely will be deported after imprisonment.").

"fine" and that his interviews were "just a formality." ECF No. 88-2 ¶ 30; ECF No. 166 Tr. 114:21-115:4.

Klaiber was interviewed a second time on March 21, 2018, during which an agent told him that if there was a problem, he may need to go before an immigration judge.  ECF No. 88-2 ¶ 31.  In each interview, Klaiber explained that he was a U.S. citizen with a valid passport.  ECF No. 158 Tr. 235:25-236:3.  Klaiber arranged to have a copy of his passport sent to the facility to corroborate his claim.  *Id.* at 236:10-13.  Klaiber attested that he was never told about any possible issue with his derivative status or that his passport was granted in error.  ECF No. 166 Tr. 116:11-18; 119:2-6.  Klaiber was released from Allenwood on September 12, 2018.  ECF No. 88-2 ¶ 31.  He began his period of supervised release on the same day.  *Id.*

Unbeknownst to Klaiber, however, Allenwood ICE Officer Amanda Campbell ("Campbell") surmised that Klaiber did not appear to qualify for derivative citizenship because his mother had naturalized long after his eighteenth birthday.  ECF No. 158 Tr. 240:6-11; 254:20-255:3.  Campbell also checked ICE's internal database where she located an internal report from Klaiber's 2013 encounter with ICE in which another agent had written that Klaiber's passport was likely issued in error.  *Id.* at 242:3-12.  Consequently, Campbell submitted a memorandum summarizing her findings to ICE's legal department for review.  *Id.* at 243:5-11. On recommendation from ICE office of legal counsel, Campbell also requested that the State Department revoke Klaiber's passport.  *Id.* at 244:17-23.  This request remained pending for the rest of Klaiber's sentence of confinement.  *Id.* at 245:18-24; 246:6-7.

After Klaiber was released from Allenwood, Campbell received confirmation that Klaiber's passport had been issued in error, he had not obtained derivative citizenship, and that

the State Department revoked his passport.  *Id.* at 245:21-25.  Campbell then sent Klaiber's file to ICE's Baltimore office to apprehend Klaiber.  *Id.* at 245:23-246:10.

On May 15, 2019, after leaving work, ICE arrested Klaiber in response to Campbell's inquiry.  ECF No. 88-2 ¶ 33.  He was placed in immigration detention where he learned that he had not obtained derivative citizenship,[4] that his passport had been revoked, and that the two offenses to which he pleaded guilty before this Court triggered presumptive mandatory deportation.  ECF No. 166 Tr. 86:21-87:1; 98:2-10.  He has been held in ICE custody ever since. ECF No. 88-2 ¶ 37.

## II.    Discussion

Klaiber asks this Court to vacate his federal criminal convictions as unconstitutionally obtained for two reasons: first, that Stelzig's misadvice regarding the immigration consequences of his guilty plea amounted to ineffective assistance of counsel in violation of the Sixth Amendment, and second that his plea was neither knowing nor voluntary, and thus in violation of the Fifth Amendment Due Process Clause.  ECF No. 88-1; ECF No. 113.  Respondents urge this Court to deny the Petition, contending that Klaiber's claims are time-barred and otherwise fail on the merits.  ECF No. 97.  For the following reasons, the Court concludes Klaiber's counsel rendered ineffective assistance and grants the petition on this basis alone.  *See* 28 U.S.C. § 2255; *Hill v. United States*, 368 U.S. 424, 426–27 (1962); *Vanater v. Boles*, 377 F.2d 898, 900 (4th Cir. 1967).

---

[4] Klaiber testified that he specifically learned while in ICE detention that the derivative citizenship requirements changed in 2001, after which time a child could obtain derivative citizenship based on the naturalization of only *one* parent.  *See* 8 U.S.C. § 1431(a) (Child Citizenship Act of 2000); ECF No. 166 Tr. 123:6-18.

### A.  Timeliness of Klaiber's Petition

Before reaching the merits, the Court must address whether Klaiber's § 2255 petition is time barred.  Although Klaiber filed his petition more than one year after his conviction became final on October 25, 2017 (ECF No. 88), Klaiber argues that pursuant to section 2255(f)(4), his petition may proceed because he filed the petition within one year after learning the facts on which his ineffectiveness claims are based.  ECF No. 113 at 5–10.  The Court agrees.

Section 2255(f)(4) provides that the limitations period shall run from "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence."  28 U.S.C. § 2255(f).  Under this subsection, the time for filing begins when "a duly diligent person in petitioner's circumstances would have discovered" the facts supporting his claims.  *Wims v. United States*, 225 F.3d 186, 190 (2d Cir. 2000); *see also United States v. Patterson*, 277 F.3d 709, 712 (4th Cir. 2002) (quoting *Wims*, 225 F.3d at 190 n.4) (Due diligence does not require the "maximum feasible diligence, only due, or reasonable, diligence.") (internal quotation marks omitted); *United States v. Caro*, 683 F. App'x 232, 233 (4th Cir. 2017) (unpublished) (stating the limitations period begins when the facts, not their legal significance, become reasonably discoverable).  Critically, during the period in which a defendant relies on the misadvice of his counsel, he cannot be said to have sufficient notice to challenge the constitutionality of his conviction.  *See Padilla v. Kentucky*, 559 U.S. 356, 366–67 (2010)*; Lee v. United States*, 137 S. Ct. 1958, 1962–63 (2017).

The gravamen of Klaiber's claims concern the erroneous immigration advice provided by his counsel against the backdrop of his twenty-year, good faith belief that he had obtained derivative citizenship.  The record evidence sufficiently supports that Klaiber could not have discovered these errors prior to his immigration arrest in May of 2019.

To begin, Klaiber reasonably relied on Stelzig's advice.  ECF No. 166 Tr. 106:24-107:5.

Klaiber knew that Stelzig had hired an immigration attorney to assist her in this respect.  *Id.* at

119:7-21.  Klaiber also pressed repeatedly for Stelzig to confirm that no immigration detainer

had been lodged, because he wanted reassurance that he was in fact a United States citizen.  *Id.*

at 82:15-17; 83:10-13; 83:21-24; ECF No. 158 93:23-24.  Stelzig not only obtained this

assurance, but advised Klaiber that in her view, he was a citizen "until proven otherwise."  *Id.* at

119:19-23; 134:10-13.  The veracity of this advice was reaffirmed for Klaiber in the final PSR,

which documented that ICE had confirmed he *was* a U.S. citizen.  Ex. 9 ¶ 57.

The Court further finds that Stelzig's advice in this respect was buttressed by Klaiber's

*twenty-year* history of governmental assurance of his lawful citizenship.  *Cf. Coleman v.*

*Thompson*, 501 U.S. 722, 753 (1991).  Since he was eighteen years old, Klaiber was issued a

valid United States passport, key proof that he was a United States citizen.  ECF No. 88-2 at 20;

ECF No. 166 Tr. 71:23-72:9; *see* 22 U.S.C. § 2705(1) (a passport shall have the "same force and

effect as proof" of citizenship as a certificate of naturalization or of citizenship); *Keil v.*

*Triveline*, 661 F.3d 981, 987 (8th Cir. 2011) (same); *Vana v. Att'y Gen.,* 341 Fed. Appx. 836,

839 (3d Cir. 2009) (unpublished) (same).  He traveled extensively on that passport, visiting

thirteen separate countries without so much as a whiff that anything was amiss.  ECF No. 166 Tr.

75:7-13.  In 2009 and 2010, he was arrested and prosecuted in state court where no government

entity raised the possibility of his unlawful immigration status.  *Id.* at 75:20-76:7.  And then in

2013, ICE confirmed that Klaiber's passport was presumptively correct proof of his citizenship.

ECF No. 88-2 ¶¶ 13-14; ECF No. 166 Tr. 78:6-11.  When considering the totality of Klaiber's

experiences, he could not be expected to look behind Stelzig's advice that he is a citizen unless

"proven otherwise" until ICE arrested him in May 2019.  ECF No. 158 Tr. 119:19-23.

The Government responds that Klaiber was first put on notice at his detention hearing that he was not a citizen based on the reference to the existence of an immigration detainer.  ECF No. 97 at 12.  This information, according to the Government, should have prompted Klaiber to learn the truth of his citizenship status.  *Id.*  But this very representation was expressly rebutted by the Government counsel several months later and in conjunction with the plea offer—the Assistant United States Attorney conveyed to Stelzig that no detainer had been lodged.  ECF No. 158 Tr. 126:7-15; 139:22-140:10.  Klaiber was also reassured at his guilty plea, when Stelzig conveyed to this Court that Klaiber had obtained "derivative citizenship" and the Government sat mum.  ECF No. 76 at 16.  The final PSR confirmed the same.  Ex. 9 ¶ 57.  Against this overwhelming affirmation, the Court cannot conclude that the initial representation at Klaiber's detention hearing was sufficient to warrant any more diligence than he exhibited.

The Government next maintains that Klaiber should have realized Stelzig's error much earlier than May 2019 when ICE interviewed him at Allenwood.  ECF No. 97 at 13.  The Court cannot so conclude.  Klaiber had two brief encounters with ICE agents at Allenwood.  ECF No. 88-2 ¶¶ 30-31; ECF No. 166 Tr. 114:21-115:10.  The first was indisputably billed as a pro-forma interview conducted with "all foreign borns."  *Id.*  The second struck Klaiber as similarly routine. ECF No. 166 115:11-22 ("They provided me the same paper to fill out again.") ("It was pretty much the same thing, fingerprints, pictures . . . .").  Klaiber vaguely recalls being told that "if there was a problem, he might need to see an immigration judge."  ECF No. 88-2 ¶¶ 30-31; ECF No. 166 Tr. 114:21-115:22.  However, even if Klaiber was directly informed of a potential problem with his citizenship at the second interview,[5] he was ultimately *released* from

---

[5] Campbell testified that she informed Klaiber of the potential complication with his citizenship status, although she never memorialized the particulars of this communication. ECF No. 166 Tr. 32:2-4.  Campbell also acknowledges that she has processed hundreds of foreign-born inmates and concedes that her time with Klaiber was very brief.  ECF No. 158 Tr. 263:6-8.  Klaiber flatly denies that Campbell ever communicated any issue with his

Allenwood, thus signaling to him that no immigration detainer had been lodged. *Id.* at 117:22-118:7.

Accordingly, the Court finds that given the unique constellation of circumstances, Klaiber reasonably relied on Stelzig's advice until confronted with the reality in May 2019 that such advice was wrong. *See Wims*, 225 F.3d at 190 (Due diligence is a particularized inquiry and only demands that the petitioner, under the specific circumstances, acted reasonably.). At that time, Klaiber was first apprised that he had not obtained derivative citizenship and faced deportation based on his having pleaded to two aggravated felonies. ECF No. 166 Tr. 86:21-24; 98:2-10; 99:10-12. Klaiber filed this petition six months later. ECF No. 88. Thus, pursuant to section 2255(f), Mr. Klaiber's petition is timely.[6]

The Court next turns to the merits of the claims.

## B. Ineffective Assistance Claims

Klaiber maintains that Stelzig rendered ineffective assistance for failing to advise him that he had likely not obtained derivative citizenship and, relatedly, that if he were not a citizen, pleading guilty to aggravated felonies would result in his certain deportation. ECF Nos. 88-1 & 167. As with any ineffectiveness claim, Klaiber must demonstrate both that (1) his counsel's performance was deficient, and that (2) he suffered prejudice arising from the deficient performance. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). In the context of plea proceedings, a petitioner can establish prejudice by showing "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."

---

immigration status. ECF No. 166 Tr. 116:11-19. The Court cannot conclude that Klaiber was put on notice as to the viability of his claims based on his single interaction with Campbell.

[6] Because the Court grants relief on Klaiber's ineffective assistance claims, it need not reach the question of whether Klaiber has shown "cause and prejudice" to excuse his procedural default. *See Massaro v. United States*, 538 U.S. 500, 504 (2003) (the procedural default rule does not apply to ineffective assistance claims asserted by federal defendants for the first time on collateral review).

*Hill v. Lockhart*, 474 U.S. 52, 59 (1985).  Put differently, a defendant "must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla*, 559 U.S. at 372.

With respect to the adequacy of counsel's advice related to immigration consequences, the Petitioner's claims are governed by the Supreme Court's decision in *Padilla*. 559 U.S. at 374. There, the Court was called upon to decide whether defense counsel possessed an affirmative duty to advise his client accurately that the offenses to which the client pleaded guilty constituted aggravated felonies under the INA, 8 U.S.C. § 1227.  *Id.* at 360.  The Court concluded that because section 1227 lays out in "succinct [and] clear" fashion that obtaining a conviction for an aggravated felony results in presumptively mandatory deportation, defense counsel maintained an affirmative duty to warn the defendant of the same in advance of his guilty plea.  *Id.* at 368. Notably, this determination applied both to the defense counsel's "affirmative misadvice" regarding the risk of deportation, as well as the failure to give correct advice where the legal analysis is "succinct [and] clear."  *Id.* at 368–70.

Of particular importance to Klaiber's case, the Court recognized that for many defendants, the desire to remain in this country is "more important . . . than any potential jail sentence."  *Id.* at 368 (quotations omitted).  For this reason, advice regarding the risk of deportation is particularly crucial in the plea context, where the possibility of avoiding mandatory deportation may be "one of the principal benefits sought by defendants deciding whether to accept a plea offer or instead to proceed to trial."  *Id.*  Failure in this respect amounts to ineffective assistance of counsel.  *Id.*

With this standard in mind, the Court turns to Klaiber's claims.

### 1. Failure to advise Klaiber about Immigration Consequences of Pleading Guilty to Aggravated Felonies

Klaiber's strongest argument for relief is his narrower one.  Klaiber rightly contends that Stelzig failed to provide "clear [and] succinct" advice as to the immigration consequences of his pleading guilty to aggravated felonies.  ECF No. 88-1 at 25; *Padilla*, 559 U.S. at 368–69.  On this matter, Klaiber's case is on all fours with *Padilla* and compels the same result.  *Id.*

 The record indisputably demonstrates that the two offenses to which Klaiber pleaded qualify as aggravated felonies under the INA.  Ex. 55; ECF No. 158 Tr. 148:12-23; *see also* 8 U.S.C. § 1101(a)(43)(E)(ii) (felon-in-possession firearm offense is aggravated felony); *id.* § 1101(a)(43)(B) (aggravated felony includes drug trafficking crime as defined under 18 U.S.C. § 924(c)(2)); 21 U.S.C. § 841(a) (possession with intent to distribute controlled substance is a drug trafficking crime under § 924(c)(2)).  However, at no point did Stelzig warn Klaiber that pleading guilty to either offense would result in mandatory deportation without any ability to seek waiver or discretionary relief in immigration court—and a permanent ban on reentering the United States.  ECF No. 166 Tr. 97:20-99:12; *see Moncrieffe v. Holder*, 569 U.S. 184, 188 (2013) (a person convicted of an aggravated felony is not only deportable but ineligible for discretionary forms of relief such as asylum or cancellation of removal).  Rather, Stelzig warned Klaiber he could "potentially" be deported if he pleaded guilty to aggravated felonies.   ECF No. 158 Tr. 148:21-23; 156:11-22; *see also* ECF No. 166 Tr. 97:20-99:12.

Pursuant to *Padilla*, Stelzig's advice was constitutionally deficient. 559 U.S. at 368–69. It was not enough to warn Klaiber about the *potential* "risk of adverse immigration consequences" when it could "easily be determined from reading the removal statute [that] his deportation was presumptively mandatory."  *Id.* at 369; *see United States v. Swaby*, 855 F.3d 233, 240 (2017) (advice that an aggravated felony conviction presented only a "risk," rather than

a certainty, of deportation was ineffective assistance); 8 U.S.C. § 1227(a)(2)(A)(iii); 8 U.S.C. § 1101(a)(43). Stelzig, therefore, was constitutionally required to warn Klaiber that these offenses were aggravated felonies subjecting him to mandatory deportation. *See Padilla*, 559 U.S. at 368–69; *Swaby*, 855 F.3d at 240.

In response, the Government maintains that because Klaiber held a U.S. passport and believed he was a citizen, Stelzig was not required under *Padilla* to advise about the "actual immigration consequences" arising from his guilty plea. ECF No. 97 at 23-24. To be sure, *Padilla* recognizes that immigration law is a "specialty of its own" and can at times be "quite complex." *Padilla*, 559 U.S. at 369. Thus, when immigration issues are not straightforward, failure to render accurate advice may not always support an ineffectiveness claim. *See id.* But that is not this case.

Stelzig's own immigration expert, Ragland, expressly advised her that Klaiber had likely not obtained derivative citizenship. Ex. 48 & 61; ECF No. 166 Tr. 171:14-16. Stelzig had received the benefit of Ragland's advice at the time she communicated the plea offer to Klaiber. Ex. 48, 61, 71 & 72. Further, the offenses to which Klaiber was pleading clearly constituted aggravated felonies. *See* 8 U.S.C. § 1227(a)(2)(A)(iii); 8 U.S.C. § 1101(a)(43); *Moncrieffe*, 569 U.S. at 188. Accordingly, Stelzig was required to, at a minimum, tell Klaiber that *if* he was not a citizen, pleading guilty to either offense would result in his certain deportation. *See id.; Padilla*, 559 U.S. at 369. This she did not do. ECF No. 166 Tr. 97:20-99:12. Accordingly, and in concert with *Padilla*, the Court concludes that Klaiber's counsel provided constitutionally inadequate assistance for failing to advise him that his guilty plea to aggravated felonies would result in certain deportation if he was not a citizen. 559 U.S. at 368–69; *Swaby*, 855 F.3d at 240.

### 2.  Misadvice Regarding Klaiber's Derivative Citizenship Status

Klaiber also more broadly contends that Stelzig misadvised him as to whether he, in fact, had obtained derivative citizenship status in advance of his guilty plea.   The Government does not contest that, on these facts, defense counsel's duties under *Padilla* include a reasonable inquiry into a client's citizenship status.  ECF No. 97 at 23-30.  And for good reason.  Stelzig could not give clear advice about immigration consequences, as is required under *Padilla*, if she had not also investigated whether Klaiber had obtained derivative citizenship.  559 U.S. at 374. In this circumstance, advice regarding the "risk of deportation"—about which *Padilla* requires reasonably clear guidance—necessarily includes consideration of a defendant's citizenship status.  *Id.* (holding *Strickland* applies to "advice regarding deportation"); *id.* at 366–67 (citing professional norms detailing counsel's duty to inquire about and verify client's citizenship status and give clear warning about actual immigration consequences).

On this record, the Court cannot avoid concluding that Stelzig failed to clearly and succinctly communicate to Klaiber the very legal advice she had obtained from her immigration expert regarding Klaiber's derivative citizenship status.  Ex. 48, 61, & 73.  Stelzig sought Ragland's assistance to guide the advice she would give Klaiber on this very point.  Ex. 39; ECF No. 158 Tr. 97:2-13; 99:2-101:4; 142:2-3.  Ragland expressly communicated to Stelzig that Klaiber's citizenship could not be based on his father's naturalization alone.  Ex. 48.  Klaiber would need to be able to *prove* that, before his eighteenth birthday, either: (1) his mother had naturalized; or that (2) she had passed away or was legally separated from Klaiber's father at the time he naturalized.  *Id.* (discussing INA 321 criteria).  Further, because Ragland and Stelzig knew Klaiber's mother was alive, still married to his dad, and had naturalized only recently, Stelzig either knew, or should have known, that Ragland was correct—that Klaiber was likely

not a citizen and that his passport was likely issued in error. *Id.*; Ex. 61; ECF No. 166 Tr. 171: 14-19. Ragland also cautioned that if the Government challenged Klaiber's citizenship, Klaiber would have the burden of proving it. Ex. 48 (Ragland asking whether Stelzig could obtain "evidence" of his mother's naturalization, death, or legal separation from Klaiber's father); ECF No. 166 Tr. 168:1-10 (individual asserting citizenship must be able to "prove" one of the above criteria with "documentary evidence"); *id.* at 185:22-25 ("[I]f you don't have proof . . . it doesn't mean anything"). Ragland's expert opinion as communicated to Stelzig was clear and succinct and should have been communicated equally cleanly to Klaiber.

It was not. The record reflects that Stelzig never reviewed with Klaiber that—with his mother alive and his parents still together—derivative citizenship at the time of his application required both of his parents to have naturalized before his eighteenth birthday. *Id.* at 86:17-25; 120:15-123:25; 126:20-127:4. Although Stelzig at times voiced general "concerns" about his citizenship status, she never clearly articulated to Klaiber what concerns she had. *Id.*; ECF No. 158 Tr. 120:2-5. Rather, Stelzig told Klaiber she considered him to be a citizen "until proven otherwise" and that there was "no[] evidence determining that he was *not* a citizen"—thereby flipping the burden of proof clearly laid out by Ragland. *Id.* at 118:2-120:5; 132:14-22; Ex. 48 & 61. Stelzig then reaffirmed for Klaiber the veracity of her position when she shared with the Court at his guilty plea hearing her "understanding" that Klaiber had "obtained ***derivative citizenship***." ECF No. 76 at 16; ECF No. 166 Tr. 106:24-107:5; 122:10-16.

Simply put, once Stelzig had the benefit of Ragland's advice on the elements of derivative citizenship and how Klaiber likely failed to meet them, *Padilla* required her to communicate to Klaiber such information clearly and succinctly. Ex. 48 & 61. Instead, Stelzig confirmed for Klaiber he had obtained derivative citizenship unless and until it was "proven

otherwise."   ECF No. 158 Tr. 118:2-120:5.  Such affirmative misadvice constitutes ineffective

assistance of counsel.  *See Padilla*, 559 U.S. at 369; *see also Strader v. Garrison*, 611 F.3d 61,

65 (4th Cir. 1979) (affirmative misadvice on parole eligibility grounds for vacating guilty plea);

*Ostrander v. Green*, 46 F.3d 347, 355 (4th Cir. 1995), *rev'd on other grounds sub nom. O'Dell v.

Netherland*, 95 F.3d 1214, 1222 (4th Cir. 1996) (citing favorably *Strader*); *United States v.

Fisher*, 711 F.3d 460, 466 (4th Cir. 2013) (citing favorably *Strader*).

    The Court next turns to whether counsel's deficient performance prejudiced Klaiber.

### 3.  Prejudice.

    To establish prejudice, Klaiber must show that he suffered an "actual and substantial

disadvantage."  *Satcher v. Pruett*, 126 F.3d 561, 572 (4th Cir. 1997).  As here, where a defendant

forfeits his right to proceed to trial, he must show a "reasonable probability that, but for [the

constitutional] error, he would not have pleaded guilty and would have insisted on going to

trial."  *Lee*, 137 S. Ct. at 1965 (quoting *Lockhart*, 474 U.S. at 59); *United States v. Akinsade*, 686

F.3d 248, 255 (4th Cir. 2012) (requiring a showing that but for the constitutional error the

petitioner would not have pled guilty and would have instead gone to trial).  A defendant may be

unable to show prejudice if either the plea agreement or the Rule 11 colloquy corrected the

misadvice and defendant acknowledged his understanding of that correction.  *See Akinsade*, 686

F.3d at 253; *Swaby*, 855 F.3d at 240.  Ultimately, whether a petitioner has shown prejudice

requires a "case-by-case" assessment based on the "totality of the evidence."  *Lee*, 137 S. Ct. at

1966.

    Klaiber has clearly shown prejudice.  The Supreme Court has now repeatedly held that

non-citizen defendants must be apprised of the immigration consequences of their conviction,

given that for many, deportation is more severe a penalty than imprisonment.  *See Padilla*, 559

U.S. at 365; *Lee*, 137 S. Ct. at 1967.  As the Court explained in *Lee*, even when the chances of success at trial are slim, the failure to warn a defendant of these consequences can be prejudicial. *Id.* at 1966–67.  This is because for someone facing deportation, "the smallest chance of success at trial may look attractive."  *Id.* at 1966.

Klaiber presented this situation.  Klaiber had been in the United States since he was eight-years old.  Ex. 2; ECF No. 166 Tr. 71:10-17.  His entire nuclear and extended family are United States Citizens.  *Id.* at 114:3-12.  For nearly four decades, he has embraced the United States as his home.  *Id.*  He knows no one in Guyana.  *Id.*; *see also Lee*, 137 S. Ct. at 1963 (petitioner immigrated at the age of 13 and has lived here for three decades); *see id.* at 1968 (entire family lived in the U.S. and has no ties to home country); *Swaby*, 855 F.3d at 243 (noting defendant has "long familial ties to the United States, including a wife and children").

Accordingly, and understandably, Klaiber also confirmed that his desire to remain in this country was of "paramount importance."  *Lee*, 137 S. Ct. at 1965; ECF No. 166 Tr. 114:3-20 ("[I]t's been a complete shock and a life-changing situation for me . . . .  I'm fighting for my life right now.").  Taken together, these facts show that deportation visited a particularly severe penalty on Klaiber.  *See Lee*, 137 S.Ct. at 1968; ECF No. 166 Tr. 109:9-22.

The record further reflects that to avoid such catastrophic results, Klaiber was prepared to defend vigorously against the criminal charges.  ECF Nos. 23, 24, & 34.  Moreover, while the *Lee* Court found prejudice even though the petitioner's chances of success at trial were "grim," 137 S. Ct. at 1965, by contrast, no party has made any such predication about Klaiber's chances of success at trial.  *See* ECF No. 97 at 31-33.  Perhaps this is so because Klaiber had consistently

pursued a vigorous defense, and at the time of his guilty plea, the Court was on the eve of holding a suppression hearing.  ECF No. 33.

Finally, and contrary to the Government's suggestion (ECF No. 97 at 31-32), neither the plea agreement nor the Rule 11 proceeding corrected counsel's errors.  Both the plea agreement and Rule 11 colloquy generally warned that Klaiber "may be subject to deportation or other loss of immigration status."  Ex. 71 at 4; ECF No. 76 at 16.  The Fourth Circuit, however, has repeatedly held that these "general and equivocal" warnings about *potential* immigration consequences do not cure an attorney's erroneous advice regarding the near certain consequences of an aggravated felony conviction.  *See Akinsade*, 686 F.3d at 254 (district court's general warning regarding possibility of deportation was insufficient to warn about consequence of mandatory deportation for an aggravated felony); *Swaby*, 855 F.3d at 240–41 ("[T]he district court's vague warning about only a risk of deportation failed to inform Akinsade that he faced likely mandatory deportation by pleading to an aggravated felony."); *United States v. Murillo*, 927 F.3d 808, 816 (4th Cir. 2019) (the plea agreement's "boilerplate language," that deportation was a possibility but that defendant wanted to plead guilty regardless, hardly established that Murillo would have pleaded guilty had he known that doing so "meant mandatory deportation.").

If anything, Klaiber's Rule 11 proceeding supports a showing of prejudice.  Klaiber affirmed his belief that he was a citizen—a statement which was then corroborated by his defense counsel and the PSR, and not challenged by the Government.  ECF No. 76 at 16; Ex. 9 ¶ 57; *cf. Lozano v. United States*, 763 Fed. App'x. 9, 10–12 (2d Cir. 2019) (notwithstanding PSR's statement that defendant was an LPR and a citizen of the Dominican Republic, Second Circuit remanded for prejudice determination); *Dat v. United States*, 920 F.3d 1192, 1196 (8th Cir. 2019) (concluding that even a PSR, which stated that defendant would be "subject to

'Administrative Removal,' and [that] immigration proceedings would commence upon his release" did not clearly remedy counsel's affirmative misadvice). This prejudice simply could not have been cured from the general admonishments in the plea agreement or Rule 11 colloquy. Accordingly, the Court finds that Klaiber has convincingly shown he suffered prejudice as a result of counsel's deficient performance. *See Lee*, 137 S. Ct. at 1966; ECF No. 166 Tr. 82:8-13; 88:13-21; 146:15-147:2.

### III.    Conclusion

In sum, Klaiber has prevailed on his ineffective assistance of counsel claims. His conviction cannot stand. *See Ross v. Wolfe*, 942 F. Supp. 2d 573, 580 (D. Md. 2013) (quoting *Lockhart,* 474 U.S. at 56). The Petition is, therefore, GRANTED and his convictions are VACATED.[7]

A separate Order follows.

7/10/2020                                           _____/S/_____

Date                                                Paula Xinis
                                                    United States District Judge

---

[7] The Court declines to reach Klaiber's alternative Due Process claim.